509 A.2d 664

**Linda SHADE**

v.

**STATE of Maryland.**

**No. 127, Sept. Term, 1985.**

Court of Appeals of Maryland.

June 5, 1986.

Mark L. Gitomer (Howard L. Cardin and Cardin & Gitomer, P.A., on brief), Baltimore, for appellant.

Jillyn K. Schulze, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

MURPHY, Chief Judge.

This case involves an alleged violation of the Maryland Home-Improvement Law, Maryland Code (1979 Repl.Vol.), Article 56, §§ 245 through 269A, and specifically § 261(a)(1), which proscribes:

"Abandonment or failure to perform, without justification, any home-improvement contract or project engaged in or undertaken by a contractor; or deviation from or disregard of plans or specifications in any material respect without the consent of the owner."

Section 261(b) provides that one who violates subsection (a) may be subjected both to civil disciplinary sanctions and to criminal prosecution. Under § 268, any person "who knowingly and wilfully" violates § 261(a)(1) is guilty of a misdemeanor, punishable by fine not exceeding $1,000 or imprisonment not to exceed six months, or both.[1]

## I.

Linda Shade, a home-improvement contractor, and Mr. and Mrs. Timothy Smith entered into a home-improvement contract for an addition to and extensive alteration of their residence. Under the terms of the contract, the work was to be completed within 120 days of the October 8, 1983 contract date; the contract price was $27,200. Payments under the contract were to be made every two weeks. The Smiths moved from their residence, pending completion of the construction project.

Shade and the Smiths subsequently signed an addendum to the contract in order to expedite the work. It specified

---

1. Section 261(a) enumerates a number of separate acts which are prohibited by the Home-Improvement Law.

that all of the work would be "completed (weather permitting) within 50 (fifty) working days from Oct. 26, 1983." When the addendum was signed, the Smiths paid Shade $19,060.00 toward the total contract price. Another addendum, dated January 6, 1984, provided for payment of a further sum for additional work. During January, Shade assured the Smiths that the work would be completed by the end of the month. The work was not completed within that time and by letter, dated February 2, 1984, the Smiths' attorney directed Shade to finish the work. A second letter, dated February 15, 1984, informed Shade that

"[b]y your failure to complete the work in a timely and workmanlike manner you have materially breached the contract and Mr. and Mrs. Smith will look to you for any damages incurred as a result of such breach. Please refrain from any further attempts to complete the work."

Thereafter, Shade discontinued work on the Smiths' house. That the work performed by Shade was of substandard quality is patently clear from the evidence.

An investigator for the Maryland-Home Improvement Commission thereafter made application for a statement of criminal charges against Shade, alleging that she "left the job incomplete on or about February 17, 1984 and knowingly and willfully refused to return to said job although requested to do so by the homeowner." The application recited that Shade's conduct "amounts to abandonment without justification in violation of Article 56, § 261(a)(1)." Based on the application, a statement of charges was issued; it specified that in violation of the statute, Shade, on or about February 17, 1984, "[d]id abandon a home improvement contract with Timothy Smith for the repair of [the Smiths' residence]."

At trial in the District Court of Maryland, Shade was found guilty and sentenced to six months' suspended sentence, three years' probation, and restitution of $5,000. After trial de novo on appeal before the Circuit Court for Baltimore City (Byrnes, J.), Shade was again found guilty. The court imposed a sentence of six months' suspended,

four years' probation, and restitution in the amount of $22,010.

In a written opinion in support of his verdict, Judge Byrnes first observed that Shade failed to procure a bond, as required by the contract. He noted that while she did "acceptable work" at the beginning of the contract period, her performance thereafter "deteriorated rapidly and substantially" in that the work was deficient and "on 12 of one group of 55 good weather working days ... [Shade] failed to appear at all." In addition, Judge Byrnes found from the evidence that there were other days when Shade worked only one-half a day or performed no work at all. There was evidence that Shade was herself rarely on the job; that she evaded the Smiths' attempts to communicate with her; that by February, 1984, there still was no roof on the addition; and that the litany of complaints included abandoned construction debris, water damage, improper joists, improper holes and openings, and other instances of seriously inferior work.

The record discloses that the Smiths had to retain another contractor, David Thomas, to complete the work for $23,-925. By affidavit, Thomas delineated the various deficiencies in the work from which Judge Byrnes concluded that Shade's "failures were so serious, wide-ranging and substantial as to constitute 'abandonment' before the recited letter of February 15, 1984." In finding Shade guilty of contract abandonment under § 261(a)(1), the court said:

"The phrase 'abandonment or failure to perform' [in § 261(a)(1) ] can apply as alternative characterizations of the same conduct or misconduct, depending upon the gravity of the offense. A failure to perform can have reference to only one aspect of a contract, in which event a pattern of such conduct and bad faith might be required as suggested by the Attorney General, 58 A.G. 388 (1973). Or, the failures can be so severe and touch nearly all obligations under a single contract as to constitute abandonment. Another alternative, of course, is pure, or

simple abandonment, i.e. deliberately walking away from a project.

"In this case, there is proof beyond a reasonable doubt that the malperformance and nonperformance constitute abandonment, and permit the Court to infer an intention to abandon. In addition, there is proof beyond a reasonable doubt of bad faith (e.g. the failure to produce the bond and the procuring from the victims of significant 'up-front' money to 'expedite' the work). Further, there is proof beyond a reasonable doubt that to the extent a pattern of such construction misconduct is a required element of proof, it is present, as to this project."

We granted certiorari to consider whether the circuit court erred in determining that Shade's actions constituted an "abandonment" of a home-improvement contract in violation of § 261(a)(1), as alleged in the charging document.

## II.

Shade contends that failure to perform a contract under § 261(a)(1) is not synonymous with or the same as an abandonment of a contract. She maintains that proof that the work was faulty and improperly done will in no event suffice to support a conviction for contract abandonment. Shade argues that to constitute abandonment under the statute the State must show both an intention to abandon and an overt act or omission to act by which such intention is carried into effect. She claims that she did not abandon the job as she and her workmen were continuously on the Smiths' premises up to and until she received notice from the Smiths' attorney by letter dated February 15, 1984 to refrain from all further work. Shade says that since she left the job at the direction of the homeowners' attorney, she did not "abandon" the contract within the contemplation of § 261(a)(1).

The State argues that there is no distinction between the terms "abandonment" and "failure to perform" in § 261(a)(1)—that the two terms simply provide alternative

characterizations of the same misconduct amounting to a material breach of a home-improvement contract. It points out that the terms are connected in a single clause within § 261(a)(1) and are separated by a semicolon from the second clause which proscribes deviation from or disregard of contract plans or specifications. According to the State, the legislative intention was to describe two separate ways in which the offense may be committed: (1) abandonment or failure to perform and (2) deviation from or disregard of plans and specifications. The State suggests that abandonment and failure to perform mean essentially the same thing in contract law, each embracing the notion that where a party's breach of contract becomes so material that it can be described as a failure to perform, there is also an abandonment. Abandonment, the State contends, may be found from a party's course of conduct. It urges that the evidence before the trial court was legally sufficient to prove that Shade's material breach of the contract constituted an abandonment.

### III.

The Home-Improvement Law has its genesis in a 1961 report of the Governor's Commission to Study the Home-Improvement Industry in Maryland. On December 28, 1961, the Commission submitted a preliminary draft of a proposed comprehensive home-improvement law. Section 15 of the proposed statute was entitled "Grounds for Refusal, Revocation or Suspension of Licenses" and provided in subsection (a)(1) that the Home-Improvement Commission was empowered:

"to refuse, suspend or revoke any licenses issued under the provisions of this subtitle where the Commission finds that the licensee is performing or attempting to perform any of the acts mentioned herein:

(1) Abandonment without justification or wilful failure to perform any home improvement contract or project engaged in or undertaken by a contractor."

A number of changes were made in the preliminary draft after public hearings were held in January of 1962. Thereafter, H.B. 75 was introduced in the 1962 Session of the General Assembly. In its original form, the bill provided in then new § 258(a) that the Commission could refuse, suspend or revoke any home-improvement license if it found a violation of the statute or the commission or attempted commission of any of a number of designated prohibited acts, including:

"(b) Abandonment without justification or willful failure to perform any home improvement contract or project engaged in or undertaken by a contractor; or willful deviation from or disregard of plans or specifications in any material respect without the consent of the owner."

Prior to passage, H.B. 75 was amended by deleting the words "without justification" following "abandonment" and reinserting those words after "willful failure to perform." Thus, as amended and enacted as ch. 133 of the Acts of 1962, an "[a]bandonment ... without justification" was prohibited as was a "willful failure to perform, without justification." A general penalty provision was included as § 248 (now § 268) of the new act; it provided that any person who "knowingly and wilfully" violated any provision of the statute would be guilty of a misdemeanor, in addition to otherwise applicable administrative penalties.

By ch. 827 of the Acts of 1963, § 258 was renumbered in part as § 261 and a new § 258 required the Commission to refuse or discontinue a license if the "home-improvement transactions of the [applicant or licensee] have been marked by a practice of failure to perform contracts."

Ch. 71 of the Acts of 1973 amended § 261 for the limited purpose, according to the bill's title, of "eliminat[ing] the necessity of showing wilful or deliberate violation of the home-improvement law in order to revoke or suspend a license." The amendment deleted the word "willful" before all of the prohibited acts, including "failure to perform." The act did not purport to affect the character of the

prohibited act of "abandonment" of a home-improvement contract.

By ch. 612 of the Acts of 1978, the legislature, under § 258, authorized the Commission to refuse to grant a home-improvement license or to suspend or revoke a license of any contractor if it found that the contractor lacked competence to engage in home-improvement contracts "as evidenced by a practice of failure to perform contracts." The section further specified that a contractor shall be deemed "to have failed to perform when the Commission finds that the work involved in his contracts has been performed in a poor and unworkmanlike manner, or when the work involved is inadequate or incomplete." [2]

## IV.

Whether "abandonment" and "failure to perform" a home-improvement contract without justification, as used in § 261(a)(1), are terms of identical meaning or are separate and distinct acts is by no means clear from the legislative history underlying enactment of the home-improvement law. In ascertaining the legislative intention, however, we apply the principle that where, as here, the statute is both remedial and penal, the remedial portion may be construed liberally while the penal provisions must be strictly construed in favor of the accused and against the State. *Briggs v. State,* 289 Md. 23, 421 A.2d 1369 (1980); *Gate-*

---

**2.** This provision was added to the home-improvement law after the Attorney General opined that a contractor's workmanship or the manner in which the contractor performed was not covered by the law, at least in the absence of some other violation that would subject the contractor to disciplinary action. 58 Op. Att'y Gen. 388 (1973). In his opinion, the Attorney General concluded that poor or defective work does not amount to a violation of that provision of the statute which provided for suspension of the license of a contractor whose transactions were marked by a failure to perform contracts. As to this, the Attorney General said that "[f]ailure to perform appears to relate to the failure to complete the work required to be done under the terms of a home improvement contract." *Id.* at 390. He said that failure to perform "relates to an act or acts of omission whereby the completion of the work agreed upon is frustrated." *Id.*

*wood v. State,* 244 Md. 609, 224 A.2d 677 (1966); *Smith v. Higinbothom,* 187 Md. 115, 48 A.2d 754 (1946). Thus, an accused cannot be found guilty of a criminal offense unless the act with which he is charged comes plainly within both the letter and spirit of the statute under which he is charged. *Groh v. Washington County,* 245 Md. 441, 226 A.2d 264 (1967); *Fowel v. State,* 206 Md. 101, 110 A.2d 524 (1955); *Cearfoss v. State,* 42 Md. 403 (1875).

█ While an unjustified abandonment of a contract would seem to involve a failure to perform, not every failure to perform necessarily constitutes an abandonment. We have no need in this case, however, to determine whether the two terms have the same meaning or are different species of the same type of misconduct. As Shade was charged with knowing and wilful "abandonment" of a home-improvement contract under § 261(a)(1), the proof must show more than mere defective or poor workmanship, *i.e.,* a failure of adequate performance, or merely that the work was not completed within the time specified in the contract, at least in the absence of evidence that the time breach was so extensive as to amount to an abandonment. We think the term "abandonment" must be afforded its common meaning. *Webster's Third New International Dictionary* 2 (3d unabr. ed. 1961) generally defines "abandon" as ceasing to assert a right with intention never again to resume or reassert it; to forsake or desert in spite of a responsibility. *Black's Law Dictionary* 2–3 (5th ed. 1979) defines "abandonment" in general terms as the giving up of a thing absolutely, and more specifically, with reference to the abandonment of a contract, as a matter of intent "and implies not only nonperformance, but an intent not to perform which may be inferred from acts which necessarily point to actual abandonment." This definition is supported by numerous cases in 1 *Words and Phrases* (1964) "abandon" and "abandonment of contract" at 7 and 46–50.

Our cases have applied a like meaning to the term "abandon" or "abandonment" in various contexts. In *Dorman v.*

*Mayor & C.C. of Balto.,* 187 Md. 678, 684, 51 A.2d 658 (1947), we said:

"Abandonment depends upon concurrence of two factors, (a) an intention to abandon and (b) some overt act, or some failure to act, which carries the implication that the owner does not claim or retain any interest in the subject matter. Time is not an essential element, but may be evidence of intention to abandon and may be considered in connection with acts manifesting such an intention."

To the same effect, *see Merryman v. Bremmer,* 250 Md. 1, 241 A.2d 558 (1968); *Canada's Tavern v. Glen Echo,* 260 Md. 206, 271 A.2d 664 (1970).

Under the first addendum to the contract, Shade was required to complete the work, and do additional work, in the amount of $3,000, weather permitting, within fifty working days from October 23, 1983. While "working days" was not defined in the contract, Shade does not dispute that she failed in this undertaking. The evidence showed that the contract was further amended by a second addendum where the Smiths, on January 6, 1984, agreed that Shade would do additional work in the amount of $1,300; no time of completion for this work was specified.

The evidence showed grossly defective workmanship and failure to have workers on the job during a number of good weather days in order to complete the work. It showed that by February 1984 the roof still had not been erected and that, on February 2, 1984, the Smiths' attorney directed that Shade expedite the work. Thereafter, from February 6 to Saturday, February 11, Shade had at least one workman on the job attempting to put up the roof, albeit defectively. There was evidence that one of Shade's workmen who was scheduled to be on the job on February 2, 1984 was unable to do so because of a death in the family. Other than Shade's failure to do any work on one group of twelve days when the weather was good, as well as on other days, the number of which is not shown by the testimony, the evi-

dence was unclear as to the total number of days or parts of days which Shade failed to work.

Shade claimed in her brief that 25% of the work was completed as of February 15, 1984, the date upon which the Smiths' discharged her. At oral argument before us, she claimed that the job was 75% completed as of that time. The record, however, fails to disclose the percentage of job completion by February 15, 1984. The only evidence in the record indicates that 25% of the work actually done was not in accordance with the contract plans and specifications.[3] In view of the substantial amount which the Smiths were required to pay to have the work completed ($23,925), we glean that a very substantial part of the project remained unfinished when Shade was directed on February 15, 1984 to discontinue all further work under the contract.

As earlier indicated, Judge Byrnes found from the evidence that Shade's failure to perform under § 261(a)(1) constituted an abandonment of the contract prior to February 15, 1984. The conviction was predicated upon the court's finding that Shade's "malperformance and nonperformance" amounted to a pattern of "construction misconduct" so gross as to permit an inference that Shade abandoned the contract prior to February 15, 1984, even though she remained on the job site until that date.

■ On the record in this case, we think that Judge Byrnes was clearly in error in his factual determination that Shade had abandoned the contract some time prior to February 15, 1984. At best, the evidence showed grossly defective workmanship and inadequate work performance prior to February 15, 1984 by a woefully inept contractor. There is, however, no legally sufficient evidence from which an inference could properly be drawn of an intent to abandon the contract nor does Shade's failure to timely perform

---

**3.** Shade was not charged with violating that part of § 261(a)(1) which makes it an offense to wilfully deviate from or disregard contract plans or specifications.

the work constitute, under the circumstances of this case, an act which itself was tantamount to an abandonment. There was no evidence that Shade was ever asked to return to the job site and refused to do so, as alleged in the application for the statement of charges. Neither was there any evidence of a complete cessation of work prior to February 15, 1984, such as would warrant a finding of actual abandonment. The evidence was to the contrary, namely, that work was continuing on the project, at least up to February 11, four days before Shade was ordered to discontinue the work. Shade's failure to procure a bond, as required by the contract, and the bad faith found by Judge Byrnes on Shade's part in accelerating payment of the contract price under the first addendum, did nothing to prove that she knowingly and wilfully abandoned the contract, as alleged in the charging document. Accordingly, the judgment, including the order for restitution in the amount of $22,010, must be reversed.[4]

JUDGMENT REVERSED, WITH COSTS.

---

**4.** We note the existence in other states of statutes similar to the Maryland-Home Improvement Law which regulate contractors generally or home-improvement contractors and list abandonment of a contract as a basis for disciplinary action or, in a few instances, criminal action. *See* Ariz.Rev.Stat.Ann. § 32–1154 A.1. (1976, 1985 Cum.Supp.) ("[a]bandonment of a contract or refusal to perform after submitting a bid on work without legal excuse for the abandonment or refusal"); Cal.Bus. & Prof.Code § 7107 (West 1975) ("[a]bandonment without legal excuse of any construction project or operation engaged in or undertaken by the licensee as a contractor"); Fla.Stat. Ann. § 520.90(1) (West 1972) ("[a]bandonment or willful failure to perform, without justification, any home improvement contract or project engaged in or undertaken by a home improvement contractor or willful deviation from or disregard of plans or specifications in any material respect without the consent of the owner"); Nev.Rev.Stat. § 624.301.1 (1986) ("[a]bandonment without legal excuse of any construction project or operation engaged in or undertaken by the licensee as a contractor"); N.M.Stat.Ann. § 60–13–23 F. (1978, 1984 Repl. Vol.) ("unjustified abandonment of any contract"); N.D.Cent.Code § 43–07–14.1 (1978 Repl.Vol.) ("[a]bandonment of any contract without legal excuse"); Utah Code Ann. § 58A–1a–10(1)(a) (1974 Repl.Vol., 1985 Cum.Supp.) ("abandonment of any contract without legal excuse").